UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANKLIN BANK,

    Plaintiff,

v.   Case No. 07-13748

MICHAEL EDWARD TINDALL, MART   Honorable Patrick J. Duggan
TRUST, TINDALL & COMPANY P.C.,
CADIEUX CORP., INC., MEMBER FIRST
MORTGAGE LLC a/k/a MEMBER FIRST
MORTGAGE, and UNITED STATES OF
AMERICA,

    Defendants.
_____/

## OPINION

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on July 30, 2009.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                U.S. DISTRICT COURT JUDGE

On September 6, 2007, Plaintiff Franklin Bank ("Plaintiff") filed this diversity lawsuit against Michael Edward Tindall ("Tindall"), in his individual capacity and as trustee of MART Trust, Tindall & Company, P.C. ("T&C"), Cadieux Corp., Inc., Michigan Catholic Credit Union ("MCCU"), Michigan First Mortgage ("MFM"), and the United States of America.[1]  In its complaint, Plaintiff asserted nine separate counts

---

[1] On November 13, 2007, by stipulation of the parties, the United States of America was dismissed without prejudice.  (Doc. No. 39.)

relating to four separate loans Plaintiff extended to Tindall or T&C. As relevant to this Opinion, one of the loans was a Home Equity Line Agreement for $325,000 ("Home Loan") which was secured by a mortgage on Tindall's residence in Grosse Pointe Farms, Michigan ("Property").[2] In a decision issued on October 27, 2008, this Court held that Tindall defaulted on the Home Loan and that Plaintiff is entitled to damages as a result of the default. (Doc. 180.) However, Tindall obtained loans from MFM and MCCU which are also secured by mortgages on the Property and the three lenders dispute the priority of their respective mortgages. This issue was presented in a trial before the Court on May 19, 2009. For the reasons that follow, this Court now holds that the order of priority of the lenders' mortgages is as follows: (1) Plaintiff, (2) MFM, and (3) MCCU.

## I.     Relevant Undisputed Factual and Procedural Background

Tindall entered into the Home Loan with Plaintiff on March 7, 2005, which was secured by a mortgage on the Property. Plaintiff's mortgage was recorded in the Wayne County Register of Deeds on March 29, 2005.

Prior to extending the $325,000 Home Loan, Plaintiff required Tindall to discharge a mortgage that he previously granted to First Franklin Financial Corporation ("First Franklin") in connection with a home equity loan in the amount of approximately $200,000.[3] Plaintiff required Tindall to discharge this mortgage because it wanted its mortgage to "replace" First Franklin's mortgage and to secure the position of second lien

---

[2] Tindall executed the mortgage as trustee of MART Trust.

[3] First Franklin has no relation or affiliation with Plaintiff.

2

holder. Plaintiff assumed that the position of first lien holder would still be occupied by First Franklin, but only as to a separate $625,000 mortgage it also had on the Property.[4]

Around the same time that Tindall obtained the Home Loan from Plaintiff, he also was consulting other lenders to refinance his first and second mortgages with First Franklin. Tindall ultimately obtained loans from MFM and MCCU for $1.125 million and $250,000 respectively, which were secured by mortgages on the Property. Tindall executed and delivered the mortgage to MFM on February 28, 2005. MFM's mortgage was recorded in the Wayne County Register of Deeds on April 4, 2005. In the meantime, Tindall executed and delivered the mortgage to MCCU on March 11, 2005. MCCU's mortgage was recorded on March 23, 2005. MCCU was aware of MFM's mortgage when MCCU obtained its interest in the Property.

Tindall used the proceeds of MFM's $1.125 million loan to pay off the first and second mortgage loans then outstanding with First Franklin. Prior to closing on its loan with Tindall, Plaintiff received a facsimile containing (1) a February 24, 2005 payoff statement concerning Tindall's second mortgage with First Franklin, reflecting a total amount due of $205,835.73, and (2) a copy of a check from "EscrowWorks, LLC" made payable to Franklin Loan Services in the amount of $205,834.73. (Pl.'s Ex. 13.) Plaintiff never inquired into the source of the funds used to pay off the First Franklin second mortgage.

In summary, Tindall's mortgages to Plaintiff, MFM, and MCCU were executed

---

[4]For ease of reference, the Court will refer to First Franklin's $200,000 mortgage as its "second mortgage" and its $625,000 mortgage as the "first mortgage."

3

and recorded as follows:

        2/28/05:       Mortgage from Tindall to MFM
        3/7/05:         Mortgage from Tindall to Plaintiff
        3/11/05:       Mortgage from Tindall to MCCU
        3/23/05:       MCCU Mortgage recorded
        3/29/05:       Plaintiff Mortgage recorded
        4/4/05:         MFM Mortgage recorded

Based on these undisputed facts, the lenders filed motions for summary judgment with respect to the priority of their mortgages.

      Plaintiff argued that its mortgage should take priority over MFM's mortgage because Plaintiff's mortgage was recorded first.[5] Although acknowledging that its mortgage was recorded last, MFM argued that its mortgage should take priority over Plaintiff's mortgage because Plaintiff had constructive or inquiry notice of MFM's interest in the Property prior to closing on the Home Loan and receiving the mortgage from Tindall.

      MFM argued that Plaintiff had constructive or inquiry notice of its mortgage based on the fact that Plaintiff required Tindall to discharge First Franklin's second mortgage before it would extend the Home Loan to him. MFM argued that the payoff statement Plaintiff received with respect to the second mortgage was addressed to MFM and provided a contact name and phone number for someone at MFM. MFM contended that this information should have led Plaintiff to inquire further about the source of the funds Tindall used to discharge the mortgage. Plaintiff responded, however, that the

---

[5]The parties agreed that the only issue to be decided is the priority between Plaintiff and MFM, as MCCU's placement falls behind MFM due to its awareness of MFM's interest in the Property when Tindall extended the mortgage to MCCU.

information relating to MFM was redacted from the copy of the payoff statement it received. Nevertheless, MFM argued that Plaintiff had constructive or inquiry notice of its mortgage because, in accordance with standard mortgage industry practice, Plaintiff should have inquired into the source of the funds Tindall used to pay off First Franklin's second mortgage and, if it had, Plaintiff would have discovered MFM's mortgage.

In a decision issued on October 29, 2008, this Court denied the parties' motions for summary judgment with respect to the priority issue. (Doc. 184.) The Court held that a genuine issue of material fact existed as to whether Plaintiff received the redacted or unredacted version of the payoff statement and thus whether it had inquiry notice of MFM's mortgage. The Court also found that Plaintiff presented evidence to create a genuine issue of material fact with respect to whether it should have inquired into the source of the funds Tindall used to discharge his second mortgage with First Franklin.

The Court held a final pretrial conference with respect to the priority issue on November 25, 2008. A bench trial was held and concluded on May 19, 2009. At trial, MFM no longer pursued its claim that Plaintiff had constructive notice of its mortgage based on the unredacted payoff statement.

**II.   Applicable Law**

Michigan is a "race-notice" state. As the relevant statute provides, in part:

> Every conveyance of real estate within the state hereafter
> made, which shall not be recorded as provided in this chapter,
> shall be void as against any subsequent purchaser in good
> faith and for a valuable consideration, of the same real estate
> or any portion thereof, whose conveyance shall be first duly
> recorded.

Mich. Comp. Laws § 565.29. "A good-faith purchaser is one who purchases without notice of a defect in the vendor's title," *Mich. Nat'l Bank & Trust Co. v. Morren*, 194 Mich. App. 404, 410, 487 N.W.2d 784, 786 (1992). "[A] properly recorded mortgage is notice to all subsequent purchasers that they take subject to any lien the mortgagor may have on the property . . .." *Ameriquest Mortgage Co. v. Alton*, 273 Mich. App. 84, 94, 731 N.W.2d 99, 105 (2005) (citing *Piech v. Beaty*, 298 Mich. 535, 538, 299 N.W. 705 (1941)). Even where a mortgage is not properly recorded, however, notice of a defect in title may arise from other facts.

"Notice" under Michigan law can be actual or constructive. *Ooley v. Collins*, 344 Mich. 148, 159, 73 N.W.2d 464, 470 (1955) (citation omitted). The Michigan Court of Appeals has defined "notice" as follows:

> Notice is whatever is sufficient to direct attention of the purchaser of realty to prior rights or equities of a third party and to enable him to ascertain their nature by inquiry. Notice need only be of the possibility of the rights of another, not positive knowledge of those rights. Notice must be of such facts that would lead any honest man, using ordinary caution, to make further inquiries in the possible rights of another in the property.

*Royce v. Duthler*, 209 Mich. App. 682, 690, 531 N.W.2d 817, 821 (1995) (citing *Schepke v. Dep't of Natural Res.*, 186 Mich. App. 532, 535, 464 N.W.2d 713 (1990)). "[T]he burden of proving notice . . . is on the party alleging it." *Ooley*, 344 Mich. at 159, 73 N.W.2d at 470.

### III. Trial Testimony

At trial, MFM maintained that Plaintiff had constructive notice of its mortgage

6

based on the fact that Plaintiff required Tindall to discharge First Franklin's second mortgage before Plaintiff would extend its loan to him and Tindall fulfilled this requirement. MFM argued that, in accordance with standard industry practice, Plaintiff should have inquired into the source of the funds Tindall used to pay off the second mortgage and, if it had, it would have ascertained that the funds were proceeds of a mortgage loan obtained by Tindall from MFM.

MFM presented Sean Mansell to establish that the standard practice in the mortgage industry is to "source" the funds used to discharge a debt any time a lender requires a borrower to discharge a debt as a prerequisite to securing a loan.[6] Mr. Mansell currently is employed by MFM as the Senior Vice President, Director of Servicing. Mr. Mansell has never worked as a loan originator. He testified, however, that he must be fully aware of origination practices because those practices impact the potential risk of a loan (i.e. whether the customer is going to be able to repay his or her debt for the life of the loan).

As a senior vice president, Mr. Mansell is part of MFM's executive team which is responsible for governing and the overall direction of the company. His particular

---

[6] Plaintiff objected at trial and has filed a written objection to Mr. Mansell testifying as an expert. Plaintiff argues that Mr. Mansell's training and experience does not qualify him to testify regarding loan originations, second mortgages, home equity lines of credit, or the standards of practice for loan officers. Plaintiff further argues that MFM did not identify Mr. Mansell as an expert, in accordance with Federal Rule of Civil Procedure 26(a)(2), and thus it did not have the opportunity to depose him as such. As the Court indicated during the trial in overruling Plaintiff's objection, it will consider Plaintiff's arguments regarding Mr. Mansell's training and experience in deciding the proper weight to give his testimony.

department is responsible for servicing loans after origination, which includes guaranteeing that local, state and federal guidelines are adhered to, credit reporting, taking of payments, payment of taxes and insurance, and dealing with foreclosures and bankruptcies.  Mr. Mansell's focus in the servicing department is reviewing loans that are at risk of foreclosure and seeking to mitigate the bank's losses and combat the re-purchase and make-whole requests from the secondary market with respect to those loans. With regard to the latter, Mr. Mansell explained that after originating a loan, a bank may sell the loan to a Government Secured Investor, such as Fannie Mae or Freddie Mac. These "secondary ambassadors" may request that the bank re-purchase the loan or reimburse it for a loss after selling the property securing the loan based on servicing or origination discrepancies.

Mr. Mansell offered that, especially in today's real estate market, it is important for lenders to verify that applicants are qualified and to identify applicants who may not be able to pay their debts through the life of their loans.  In fact, he testified that the number one goal of lenders is to safely forecast whether applicants are going to be able to meet their obligations in regards to their debts.  To make this risk assessment, Mr. Mansell testified that lenders evaluate a person's credit history, income, debt ratio, and liquidity.  Further, if the lender is requiring the applicant to make a down payment or satisfy existing liens, the lender inquires into the source of the funds used.

Mr. Mansell provided two reasons why lenders, as a practice, "source" these funds. First, to insure that the money the borrower used to discharge the debt is not coming from an intervening loan that will affect the bank's position with respect to the property

8

mortgaged. Mr. Mansell emphasized that this is particularly important where there are inherent delays in the county's recording system and he offered that there was a "substantial problem" with delays in Wayne County when the mortgages at issue in this lawsuit were executed and recorded. He estimated the delay at the time to be between six months and one year. The second reason Mr. Mansell provided for why banks should source these funds is to insure that the borrower has the means to repay the loan. Mr. Mansell stated that if Plaintiff had adhered to standard industry practice, it would have asked Tindall to identify the source of the funds used to pay off First Franklin's second mortgage and required supporting documentation.

During cross-examination, Mr. Mansell acknowledged that the industry standard he described is based on Freddie Mac and Fannie Mae guidelines and that private investors may proceed with a loan even if those guidelines are not satisfied. Mr. Mansell further acknowledged that MFM in fact did just that with respect to its loan to Tindall. (Pl.'s Ex. 1.) When presented with Plaintiff's and MCCU's mortgages with respect to the Property, Mr. Mansell conceded that both were recorded in less than two weeks. In looking at MFM's loan file relating to Tindall, Mr. Mansell also conceded that MFM relied on a fraudulent document prepared by Tindall under the alias Ron Matthews to verify that Tindall possessed the means to make a monthly mortgage payment of over $7,500. (Pl.'s Ex. 2.)

When asked by Plaintiff's counsel to identify the document(s) that suggested that the proceeds of MFM's loan were used by Tindall to discharge First Franklin's second mortgage, Mr. Mansell conceded that he could not identify any document. Mr. Mansell

9

further conceded that Plaintiff's loan file for Tindall contained a credit application–certified and signed by Tindall on the day he closed the loan with Plaintiff– that failed to identify MFM's loan as an outstanding debt. (Pl.'s Ex. 3.)

MFM next called Dave Gebhardt as a witness. Mr. Gebhardt previously was employed as Plaintiff's Regional Consumer Lender Coordinator. In that position, he handled Tindall's application for the Home Loan. MFM's counsel asked Mr. Gebhardt whether Plaintiff required Tindall to discharge First Franklin's second mortgage because the bank determined Tindall was not qualified to have that line of credit and Plaintiff's line of credit at the same time. In response, Mr. Gebhardt explained that Plaintiff required Tindall to pay off the First Franklin mortgage only because it is Plaintiff's general practice to not fall below the second mortgage position. In other words, before extending a line of credit to a borrower, Plaintiff requires the borrower to discharge all but the borrower's first mortgage.

When questioned by Plaintiff's counsel, Mr. Gebhardt provided that Plaintiff did not find it necessary to source the funds Tindall used to pay off First Franklin's second mortgage because it believed, based on information already available to it, that Tindall had the means to discharge the $200,000 loan without assistance. Specifically, Mr. Gebhardt relied on Tindall's having been in business as an attorney for twenty-six years and that he had good assets and plenty of equity in the Property. (*See* Pl.'s Ex. 3.) This information, as well as Tindall's monthly gross salary of $25,000, was reflected on the credit application that Tindall completed. (*Id.*) Mr. Gebhardt testified that Plaintiff also took various steps to identify the liens on the Property.

10

Specifically, on the credit application, Tindall was required to identify his existing outstanding debts. (*Id.*) On March 7, 2005, the date Tindall closed on the Home Loan with Plaintiff, he signed the application certifying that the information contained therein was correct. (*Id.*) Further, Plaintiff obtained a Commitment for Title Insurance that listed any outstanding liens on the Property. (Pl.'s Exs. 6, 7.) Finally, by signing the mortgage, Tindall warranted that "the property is unencumbered, except for encumbrances of record." (Pl.'s Ex. 12 ¶ 6.)

Mr. Gebhardt testified that, of the almost one thousand loans that he has processed, he has never had a situation where the applicant failed to disclose an active mortgage. He confirmed that failing to do so constitutes a felony.

At the close of Mr. Gebhardt's testimony, MFM rested. Plaintiff then called Thomas William Elliott as an expert witness. Mr. Elliott is the Senior Consultant and Manager of Loan Compliance Services at Young & Associates, a bank consulting firm in Canton, Ohio. He specializes in regulatory compliance issues,. Plaintiff retained Mr. Elliott to review its loan file with respect to the Home Loan and determine whether Plaintiff had constructive notice of MFM's loan.

Mr. Elliott testified that, in his opinion, Plaintiff did not have constructive notice of MFM's loan and he explained the reasons why he reached this conclusion. First, at closing, Tindall signed documents (the credit application and mortgage) representing that there were no other liens on the Property other than those disclosed. Knowing that Tindall is an experienced attorney, Mr. Elliott presumed that he understood the documents he signed and the risks associated with certifying the correctness of the

11

information contained therein. Second, Tindall's income and other significant assets indicated that he had the wherewithal to pay off the First Franklin second mortgage. Mr. Elliott explained that, in comparison to an applicant earning $30,000 a year, it was logical and reasonable to conclude that Tindall had the means to discharge the loan with his own funds.

Mr. Elliott also responded to Mr. Mansell's testimony regarding the standard practice of the mortgage industry with respect to loans discharged during the application process. Mr. Elliott provided that, unlike first mortgages, the vast majority of home equity loans or lines of credit are designed to stay on the books of the lending bank instead of being sold in the secondary market. Therefore, the standards a bank needs to follow with respect to these loans are those of the bank and not those of the secondary market. According to Mr. Elliott, banks are less careful about loans remaining in-house than they are about loans that are destined for the secondary market because, with the latter, auditors are "looking over [the bank's] shoulder" to make sure investors are protected. Mr. Elliott provided that when a bank requires the discharge of a mortgage before extending a home equity loan, it therefore can choose whether to source the funds used by the borrower to pay off the debt. According to Mr. Elliott, it would be reasonable for a bank not to source the funds if it possesses other information to assure itself of the borrower's ability to repay the loan and its position with respect to the property mortgaged. In Mr. Elliott's opinion, Plaintiff had these assurances with respect to its loan to Tindall and there was nothing to render it suspicious as to the existence of undisclosed mortgages.

**IV.     Analysis**

Based on the evidence presented, the Court does not find that Plaintiff had constructive notice of MFM's loan to Tindall. First, the Court does not believe that MFM has identified facts "sufficient to direct [Plaintiff's] attention . . . to [MFM's] prior rights." *Royce, supra*. Looking at the information known to Plaintiff, the Court finds nothing to arose its suspicions regarding Tindall's discharge of First Franklin's second mortgage so as to cause Plaintiff to inquire further as to the source of the payoff funds. The information collected by Plaintiff indicated that Tindall had the means to discharge the $200,000 loan without assistance and that the only liens on the Property were those that had been identified. This Court believes that a reasonable lender could conclude that an experienced attorney, such as Tindall, understood the documents he signed, the representations being made, and the consequences of providing false or inaccurate information and could rely on the borrower's representations.

For two reasons, the Court is not persuaded by Mr. Mansell's testimony that, based on industry practice, Tindall's discharge of First Franklin's second mortgage should have directed Plaintiff's attention to the possibility of undeclared liens on the Property and caused Plaintiff to source the funds used to make the payoff. First, the Court believes that the standard described by Mr. Mansell applies only to loans destined for the secondary market. It appears to the Court that Mr. Mansell's experience and training have been focused on first mortgages rather than home equity loans or lines of credit. As he provided, his current and last banking positions have been in servicing and his primary responsibilities have been combating the purchases and make-whole requests from

13

secondary ambassadors. Thus, his expertise is tied to loans unlike Plaintiff's loan to Tindall. As Mr. Elliott provided, the standards described by Mr. Mansell do not apply to the vast majority of home equity loans which are intended to stay on the books of the lending banks.

Second, Mr. Mansell testified that lenders inquire into the source of payoff funds in order to gain assurances in two areas: (1) their position with respect to the property mortgaged and (2) the applicant's ability to satisfy his or her obligation with respect to the debt. Both guarantees, however, were otherwise secured by Plaintiff with respect to Tindall's loan. As Mr. Gebhardt and Mr. Elliott explained, Plaintiff possessed information that adequately verified its position with respect to the Property and assessed the risk of the loan not being satisfied. In other words, Plaintiff obtained other assurances with respect to its priority and Tindall's ability to repay the loan. Notably, Mr. Gebhardt testified that he never had a situation where the applicant failed to disclose an active mortgage (other than this one) and that it is a felony to fail to do so. MFM has offered no basis for this Court to find that it was unreasonable for Plaintiff to rely on the certified information it received from Tindall.[7]

Moreover, MFM offered no evidence from which this Court can conclude that Plaintiff would have discovered MFM's loan if it had inquired into the source of the payoff funds. As set forth above, "[n]otice is whatever is sufficient to direct attention of

---

[7]This information has since been found false and Tindall's capacity for fraud has been revealed. Nevertheless, MFM fails to identify any evidence which would have led Plaintiff, at the time, to suspect that it could not rely on the information certified by Tindall to be true.

14

the purchaser of realty to prior rights or equities of a third party *and to enable him to ascertain their nature by inquiry.*" *Royce*, 209 Mich. App. at 690, 531 N.W.2d at 821 (emphasis added). No testimony was presented indicating that Plaintiff could have obtained information regarding the source of the funds through any person or entity other than Plaintiff. No evidence was offered to support the suggestion of MFM's counsel in closing argument that either First Franklin or EscrowWorks was aware of or could lawfully and/or ethically reveal to Plaintiff the source of the funds. Thus Plaintiff had to rely on Tindall for this information.

Yet Plaintiff did make inquiries of Tindall that should have, but did not, reveal MFM's loan. Tindall signed at least two documents after granting MFM a mortgage on the Property which required him to identify any liens on the Property and certify that the information he provided was true. Nevertheless, Tindall failed to list MFM's mortgage. In assessing the likelihood of Plaintiff uncovering MFM's mortgage through Tindall, the Court also finds it significant that when MFM asked Tindall for independent verification of information, Tindall provided a document signed by his alias, Ron Matthews.

In summary, the Court finds that MFM has not satisfied its burden of presenting clear and convincing evidence that Plaintiff had constructive notice of its loan to Tindall. MFM fails to identify facts that would have led a reasonable lender, using ordinary caution, to make further inquiries concerning the possible rights of another lender in the Property. MFM also has not presented evidence suggesting that further inquiries by Plaintiff would have enabled it to ascertain MFM's interest in the Property.

**V.     Conclusion**

For the above reasons, this Court holds that Plaintiff's mortgage with respect to the Property takes priority over MFM's mortgage. As MCCU concedes, its mortgage is secondary to MFM's mortgage. Plaintiff shall submit a Judgment consistent with this Opinion and the Court's prior decisions within ten days.[8]

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

---

[8]Plaintiff shall serve Defendants with a copy of its proposed Judgment. If Defendants have any objections to Plaintiff's proposal, they should notify the Court in writing within ten days of receiving service.

Copies to:
Sheri B. Cataldo
Mark A. Chaban
Michelle M. Wezner
Chiara F. Mattieson
Michael E. Tindall